## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **FRANCIS FALLS, ET AL** | **CIVIL ACTION** |
| **VERSUS** | **NO:    16-2499** |
| **BOARD OF COMMISSIONERS OF THE NEW ORLEANS REGIONAL TRANSIT AUTHORITY, ET AL** | **UNITED STATES MAGISTRATE JUDGE KAREN WELLS ROBY** |

## ORDER AND REASONS

Before the Court is a **Motion to Determine Damages (R. Doc. 57)** and a **Motion to Determine Attorneys' Fees and Costs (R. Doc. 61)** filed by Plaintiffs Francis Falls ("Falls"), Mitchell Miraglia ("Miraglia"), and Thad Tatum ("Tatum") (collectively "Plaintiffs") seeking an order of the Court awarding each Plaintiff $10,000 in damages as well as $48,430.50 in attorneys' fees and $7,573.96 in costs for all Plaintiffs. The motions are opposed. R. Doc. 65; R. Doc. 64. Both motions were submitted on March 22, 2017 and heard without oral argument.

## I.    Background

This action was initially filed in the District Court on March 28, 2016 seeking injunctive and declaratory relief, damages, and attorneys' fees and costs pursuant to Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.* ("ADA") and the Rehabilitation Act of 1973, 29 U.S.C. § 794 *et seq.* ("RA"). R. Doc. 1. The Plaintiffs allege that Defendants the City of New Orleans and the Board of Commissioners of the New Orleans Regional Transit Authority have violated the ADA in connection with the bus stop system in New Orleans. In particular, the Plaintiffs allege that nearly 94.3% of all bus stops are non-compliant with ADA requirements. The Plaintiffs argue that the Defendants have failed to construct or alter bus stops to ensure accessibility and have failed to provide program access at the existing bus stops. R. Doc. 1. As such, the Plaintiffs allege that the Defendants have discriminated against them and continue to do so by

excluding/denying the Plaintiffs the full and equal benefits of their services and by failing to have accessible facilities or taking steps to make them accessible. *Id.* at p. 16.

On December 23, 2016, the Parties consented to proceed before the undersigned United States Magistrate Judge under the provisions of 28 U.S.C. § 636(c). Thereafter, on February 10, 2017, the undersigned approved and ratified the Parties' Settlement Agreement (R. Doc. 55). R. Doc. 54. The Settlement Agreement provided for the improvement of existing ADA compliance procedures, a plan for bringing bus stops into ADA compliance, the selection by Plaintiffs of priority bus stops to be brought into compliance, a time frame for compliance as well as a method for the monitoring and enforcement of the settlement agreement. R. Doc. 54, p. 3-10. In return, the Plaintiffs agreed to release their claims for injunctive and declaratory relief against the Defendants. *Id.* at p. 10-11. Finally, as part of the Settlement Agreement, the Parties agreed to submit the issues of Damages and Attorneys' Fees and Costs for determination by the undersigned. *Id.* at p. 10.

## II.     **Motion to Determine Damages**

### A.     **Background**

In accordance with the Parties' Settlement Agreement (R. Doc. 55) and this Court's order (R. Doc. 54), the Plaintiffs submitted their Motion to Determine Damages (R. Doc. 57) on February 20, 2017. In total, the Plaintiffs request $10,000 each in damages. R. Doc. 57. The Plaintiffs argue that they are entitled to damages under Title II of the ADA because they are qualified individuals that were excluded from participation or denied benefits of services, programs or activities and that such exclusion or discrimination was because of their disability. R. Doc. 57-1, p. 12. They argue that they were discriminated against when the Defendants failed to modify/construct bus stops in compliance with applicable standards and when the Defendants failed to provide program access.

In opposition, the Defendants argue that the Plaintiffs are not entitled to damages because: (i) there is no evidence of intentional discrimination; and (ii) the Plaintiffs have not carried their burden of proof to lay out a prima facie case of discrimination because Tatum is not a qualified individual and all defendants have offered no evidence of any alleged discrimination by reason of their disability. R. Doc. 65.

**B.    Standard of Review**

The Plaintiffs have brought claims seeking damages under both Title II of the ADA and the Rehabilitation Act. "The Rehabilitation Act and the ADA both prohibit discrimination against qualified individuals with disabilities; they employ many of the same legal standards and offer the same remedies." *Sweeney v. Texas State Univ.*, No. 14-910, 2016 WL 3829552 at *2 (W.D. Tex. July 11, 2016) (citing *Maples v. Univ. of Texas Med. Branch at Galveston*, 901 F. Supp. 2d 874, 878 (S.D. Tex. 2012), aff'd, 524 Fed.Appx. 93 (5th Cir. 2013)); *see also Miraglia v. Bd. of Supervisors of Louisiana State Museum,* No. 15-4947, 2016 WL 6215976, at *1 n.1 (E.D. La. Oct. 25, 2016) (citing *Frame v. City of Arlington*, 657 F.3d 215, 223-24 (5th Cir. 2011)) ("The ADA and § 504 of the Rehabilitation Act (29 U.S.C. § 794(a)) are generally interpreted *in para materia* and employ the same legal standards. Plaintiff's briefing is limited to Title II which is not problematic under Fifth Circuit precedent.").

"The ADA is a 'broad mandate' of 'comprehensive character' and 'sweeping purpose' intended 'to eliminate discrimination against disabled individuals, and to integrate them into the economic and social mainstream of American life.'" *Frame*, 657 F.3d at 223 (citing *PGA Tour, Inc. v. Martin,* 532 U.S. 661, 675 (2001)). Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied

the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Under Fifth Circuit Precedent,

> To establish a prima facie case of discrimination under the ADA, a plaintiff must demonstrate: (1) that he is a qualified individual within the meaning of the ADA; (2) that he is being excluded from participation in, or being denied benefits of, services, programs, or activities for which the public entity is responsible, or is otherwise being discriminated against by the public entity; and (3) that such exclusion, denial of benefits, or discrimination is by reason of his disability.

*Melton v. Dallas Area Rapid Transit*, 391 F.3d 669, 671-72 (5th Cir. 2004); *Greer v. Richardson Indep. Sch. Dist.*, 472 F. App'x 287, 292 (5th Cir. 2012) (unpublished). Moreover, "[a] plaintiff asserting a private cause of action for violations of the ADA or the RA may only recover compensatory damages upon a showing of intentional discrimination." *Delano-Pyle v. Victoria Cty.*, 302 F.3d 567, 574 (5th Cir. 2002).

### C. <u>Analysis</u>

Here, the Plaintiffs seek damages under Title II of the ADA. The Plaintiffs argue that they are entitled to damages under Title II of the ADA because they are qualified individuals that were excluded from participation or denied benefits of services, programs or activities and that such exclusion or discrimination was because of their disability. R. Doc. 57-1, p. 12. The Defendants oppose the award of damages arguing that (i) there is no evidence of intentional discrimination; and (ii) the Plaintiffs have not carried their burden of proof to lay out a prima facie case of discrimination because Tatum is not a qualified individual and all defendants have offered no evidence of any alleged discrimination by reason of their disability. R. Doc. 65. In order for the Plaintiffs to prevail, they must demonstrate that they are qualified individuals that were either

denied benefits of or otherwise discriminated against by the Defendants by reason of their disability. *See Melton*, 391 F.3d at 671-72.

### 1.  Plaintiffs Are Qualified Individuals Under the ADA

Under 42 U.S.C. § 12102(1)(A), an individual is disabled under the ADA where "a physical or mental impairment that substantially limits one or more major life activities of such individual." A "major life activity" includes, but is not limited to, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A). "Additionally, the 2008 Amendments to the ADA stress that the definition of disability shall be construed in favor of a broad number of individuals under the Act, to the maximum extent permitted by the Act." *Mitchell v. Universal Health Servs., Inc.*, No. 15-5963, 2017 WL 993146, at *2 (E.D. La. Mar. 15, 2017) (slip copy) (citing 42 U.S.C. § 12102(4)(A)).

The Parties agree that Miraglia and Falls are qualified individuals under the ADA. R. Doc. 65, p. 14. However, the Defendants argue that that Tatum should not be considered a qualified individual because the Plaintiffs fail to address or present any analysis or explanation as to whether Tatum's physical impairments results in substantial limitation in a major life activity. *Id.* In turn, the Plaintiffs argue that Tatum is a qualified individual because he is a C-7 paraplegic as a result of a puncture wound to the neck in 1988. R. Doc. 57-1, p. 10.

In considering Tatum's physical impairments as a result of his paraplegia, the Court finds that Tatum is a qualified individual under the ADA. During his deposition, Tatum explained that as a result of his paraplegia he suffers limitations to his right side. While Tatum uses a four-legged walker around his home as a result of physical therapy and can drive, he strictly uses a wheelchair to get around outside of his house. R. Doc. 57-14, p. 41, Tr. 15-17. When he travels around in his

car, Tatum relies on others to place and remove his wheelchair from his car. *Id.* at p. 66, 117-18. Given his physical limitations as a result of paraplegia, the Court finds that Tatum is certainly substantially limited in major life activities as contemplated by 42 U.S.C. § 12102, including walking, standing, and bending.

## 2. Being Discriminated Against by a Public Entity

In order to establish discrimination under Title II, the Plaintiffs must also demonstrate that they were excluded from participation in, or being denied benefits of, services, programs, or activities for which the public entity is responsible, or is otherwise being discriminated against by the public entity. When determining if a public entity has discriminated against an individual in relation to ensuring public facilities and programs are accessible to disabled individuals, "Title II differentiates between 'existing structures,' i.e., structures built prior to the Act taking effect in January 1992, and facilities built or altered after January 1992." *Miraglia*, 2016 WL 6215976, at *1 (citing *Greer*, 472 F. App'x at 291).

First, as to facilities modified or constructed after 1992, structures that are not built in compliance with the applicable Americans with Disabilities Act Accessibility Guidelines ("ADAAG") guidelines constitute discrimination. *See Greer*, 472 F. App'x at 300 ("The parking lot and ramp have both been modified or constructed after 1992 and thus do not fall within the more flexible guidelines for existing facilities. Instead the ADAAG guidelines apply"). As the Fifth Circuit noted in *Frame*, "when a city decides to build or alter a [structure] but makes that [structure] inaccessible to individuals with disabilities without adequate justification, the city discriminates within the meaning of Title II." 657 F.3d at 230-31.

Here, the record reflects that the City has discriminated in relation to modified or constructed facilities after 1992. In a report by the Plaintiffs' expert, the Plaintiffs' expert reported

that 60 of 69 newly constructed/modified bus stops failed to comply with the applicable accessibility requirements of the ADA. R. Doc. 57-1, p. 18; *see also* R. Doc. 57-5. Notably, the Defendants do not appear to contest these findings nor have they offered an adequate justification for this failure to comply other than an acknowledgment that they were allegedly in the process of developing a plan to make modifications. So, as to newly constructed/modified structures, the Court finds that the Plaintiffs have demonstrated discrimination.

Second, as to existing facilities, courts have applied a "less stringent and more flexible" standard looking at overall access to the program—"program accessibility"—rather than technical compliance at each facility. *See Greer*, 472 F. App'x at 291 ("When considering ADA compliance for such existing structures, the touchstone is thus not the facility's technical compliance with the ADAAG, but is instead 'program accessibility.'"). As the Court has recently explained:

> When considering ADA compliance for existing structures, the appropriate standard is "program accessibility" not facility accessibility. *Id.* For that standard the federal regulations provide: "A public entity shall operate each service, program, or activity so that the service, program, or activity, *when viewed in its entirety*, is readily accessible to and usable by individuals with disabilities." 28 C.F.R. § 35.150(a) (emphasis added). Making a program or activity accessible under this standard does not require a public entity to make all of its existing facilities accessible to disabled individuals nor does it require a public entity to take an action that would place an undue burden on the entity. *Id.* § 35.150(a)(1), (3). Furthermore, the regulations do not provide objective criteria for evaluating program accessibility. *Greer*, 472 Fed. Appx. at 291. While an existing structure's compliance with ADAAG regulations may be informative, program accessibility is ultimately a subjective determination by viewing the program or activity at issue in its entirety and not solely by evaluating individual elements of the facility where the program is held. *Id.*

*Miraglia*, 2016 WL 6215976, at *2 (citing *Greer*, 472 Fed. Appx. at 291).

Here, the Court finds that the Defendants have discriminated under the ADA in regards to existing bus stops. The Manning Report—a report commissioned by the Defendants prior to the instant litigation to evaluate the accessibility of every single bus stop within the New Orleans bus

system (R. Doc. 65, p. 11)—determined that 94.3% of the bus stops do not comply with accessibility requirements of the ADA. R. Doc. 57-1, p. 20. Moreover, each of the Plaintiffs gave anecdotal evidence of difficulties accessing the bus stops—and the bus system as a result—given the non-compliance and inaccessibility including: having to make risky maneuvers and risking flipping over; having to avoid certain non-compliant bus stops; getting stuck because a lack of concrete at certain stops; and having to miss certain buses because drivers did not want to be liable for having Tatum enter the bus on the street. *Id.* at p. 6-11; s*ee, e.g.,* 57-14, p. 6-7 (Miraglia), 44-46 (Tatum), 74-77 (Falls). Given the pervasive non-compliance and the Plaintiffs' difficulties in accessing the bus stops, the Court finds that in its entirety the Plaintiffs were denied access and thus discriminated against.

### 3.        Plaintiffs Were Discriminated Against By Reason of Their Disabilities

In order to establish a *prima facie* case of discrimination, the Plaintiffs must also establish that they were discriminated by basis of their disability. *Melton*, 391 F.3d at 671-72. The Plaintiffs argue that but for the discrimination caused by the system-wide barriers they would have enjoyed the bus stops fully and fairly. R. Doc. 57-1, p. 21-22. In opposition, the Defendants argue that the Plaintiffs demonstrated use of the bus stops despite any accessibility problems demonstrates that they were not denied use of the systems. R. Doc. 65, p. 14.

The Court finds that the discrimination detailed above—the denial of safe use of or accessible bus stops—was caused solely by the fact that the Plaintiffs are disabled. The problems they encountered using the stops held their origin in the fact that they were confined to wheel-chairs while attempting to use the bus stops. As such, given the above, the Court finds that the Plaintiffs have established a *prima facie* case of discrimination under the ADA.

### 4. Plaintiffs Have Demonstrated Intentional Discrimination

Finally, the Defendants contend that the Plaintiffs cannot demonstrate discrimination because they have not shown that they were intentionally discriminated against and therefore are not entitled to compensatory damages. R. Doc. 65, p. 9. The Defendants argue that because the Plaintiffs have not shown intentional discrimination, or personal ill will or malice towards the disabled person, they have not demonstrated discrimination such that they are entitled to damages. In turn, the Plaintiffs argue that the failure to provide accessible bus stops does constitute intentional discrimination because they did not comply with their affirmative duty to accommodate. R. Doc. 71, p. 2-3.

Indeed, "[a] plaintiff asserting a private cause of action for violations of the ADA or the RA may only recover compensatory damages upon a showing of intentional discrimination." *Delano-Pyle*, 302 F.3d at 574. However, what constitutes intentional discrimination appears to be an open-question of law in the Fifth Circuit. In *Perez v. Doctors Hosp. at Renaissance, Ltd.*, 624 F. App'x 180 (5th Cir. 2015), the Fifth Circuit has recently noted that: "We did not define what we meant by intent in *Delano–Pyle*. Some circuits have held that deliberate indifference suffices. . . .[However] [t]he parties have not briefed the issue in any depth, and we decline to make new law on the nature of intent at this time." 624 F. App'x at 182; *see also McCollum v. Livingston*, no. 14-3253, 2017 WL 2215627, at *2 (S.D. Tex. May 19, 2017) ("The Fifth Circuit has not yet decided whether deliberate indifference or something more, is necessary to show intentional discrimination.").

In defining what constitutes intentional discrimination, two approaches have developed. First, the "deliberate indifference" standard appears to require a finding that "the defendant *knew* that harm to a federally protected right was substantially likely and ... *failed* to act on that

likelihood." *T.W. ex rel. Wilson v. Sch. Bd. of Seminole Cty., Fla.,* 610 F.3d 588, 604 (11th Cir. 2010). Second, a stricter standard requires a finding of "[d]iscriminatory animus…. [that is] prejudice, spite, or ill will." *Liese v. Indian River Cty. Hosp. Dist.*, 701 F.3d 334, 344 (11th Cir. 2012).

While the Court agrees with the Defendants that there is nothing in the record to demonstrate prejudice, ill-will, or malice directed at the Plaintiffs in this case, the Court does believe that the Defendants' conduct rises to the level of deliberate indifference as discussed below. Given then that the two approaches to intentional discrimination would dictate different results, the undersigned cannot forgo grappling with what it is meant by "intentional determination" under this statutory scheme.

As an initial matter, the Court rejects the Plaintiffs' argument that intentional discrimination can be found because the Defendants have failed to comply with an affirmative obligation to accommodate. R. Doc. 71, p. 2. In support of this argument, the Plaintiffs cite to *Delano-Pyle, Bennett-Nelson v. Louisiana Bd. of Regents,* and *Perez. Id.* at p. 2-3. However, the Plaintiffs' reliance on these cases strike the Court as misplaced and demonstrate a certain level of liberty taken with the case law. First, the Fifth Circuit has rejected an argument that *Bennett-Nelson* somehow weighed in on the import of animus in connection with intentional discrimination, and the undersigned agrees with this reading. *Estate of A.R. v. Myzyka*, 543 F. App'x 363, 301 Ed. Law Rep. 113, at n.2 (5th Cir. Oct. 16, 2013) (unpublished) (citing *Bennett-Nelson v. Louisiana Bd. of Regents,* 431 F.3d 448 (5th Cir.2005)) ("A.R. points to our decision in *Bennett–Nelson v. Louisiana Board of Regents* to support the proposition that proof of animus is not required. That decision, however, concerned 'the sole issue ... [of] whether Louisiana's Eleventh Amendment sovereign immunity' barred claims under the ADA and Section 504.").

Second, as noted above, *Perez* explicitly refused to determine what intentional discrimination meant. 624 F. App'x at 182. Indeed, the Fifth Circuit in *Perez* only determined that there was "a genuine dispute of material fact as to whether [the defendant] intentionally discriminated against the plaintiffs" and invited the district court to "if necessary to resolve the case, make the initial effort to define intent under this statutory scheme." *Id.* at 186.

Finally, in regards to *Delano-Pyle*, the Court did not define intentional discrimination. While the Plaintiff cites language from the Court's discussion of "whether a policy of discrimination must be identified to sustain a claim under the ADA or the RA," the Court's discussion of intentional discrimination does not appear to place the emphasis on affirmative obligations that the Plaintiffs wish the Court to read. 302 F.3d at 575. Rather, in finding intentional discrimination, the Court appears to place greater weight on the Police Officer's failure to adapt or provide an accommodation to a hearing-impaired individual despite obvious signs that the disabled individual was not understanding. *Id.* at 575-76. There, the Fifth Circuit appears to find intentional discrimination in the Officer's decision to knowingly ignore the needs of a disabled individual.

Nor is the Court convinced by the Defendants' argument that there must be some finding of ill-will or malice directed at the Plaintiffs. Certainly, in *Delano-Pyle,* the Fifth Circuit appears to suggest that "[t]here is no 'deliberate indifference' standard applicable to public entities for purposes of the ADA or the RA." *Id.* at 575. However, whatever significance this statement carries in the current discussion is undercut by the Fifth Circuit's later statement that "intentional discrimination" was not defined while noting explicitly that other circuits had adopted the deliberate indifference standard. *Perez*, 624 F. App'x at 182.

Moreover, the Defendants also cite the Fifth Circuit in *Campbell v. Lamar Inst. of Tech.*, 842 F.3d 375 (5th Cir. 2016), wherein the court suggested that summary judgment in terms of intentional discrimination should be granted "[w]hen the record is 'devoid of evidence of malice, ill-will, or efforts ... to impede' a disabled student's progress." 842 F.3d at 380. However, the *Campbell* decision appears distinguishable in two important aspects. First, *Campbell* analyzed intentional discrimination in relation to request for reasonable accommodation the defendant allegedly denied the plaintiff—which in general will involve a more personal dichotomy—rather than a more generalized accessibility claim leveled against a public entity. To this Court, while evidence of personal malice might be required in the more personal request for an accommodation and makes sense given the level of interaction between the qualified individual and the discriminating entity, such a requirement would be difficult if not impossible to meet in discrimination claims connected to more generalized accessibility claims wherein the discriminatory denial of an individuals' right to access likely occurs without any personal interaction between the qualified individual and the discriminating entity. Second, the Court also notes that the *Campbell* decision is also influenced by and involves the deference considerations given to institutions in connection with education. *Id.*

Rather, based on its review of the defining characteristics of the ADA and the trend in this country, the undersigned finds that the deliberate indifference standard should apply, especially in connection with the type of accessibility claim *sub judice*. Certainly, when faced with this same question of defining "intentional discrimination," a number of other Circuits have adopted the deliberate indifference standard. *Freydel v. New York Hosp.*, 242 F.3d 365, 2000 WL 1836755 (2d Cir. 2000) (table opinion) (quoting *Bartlett v. New York State Bd. of Law Examiners,* 156 F.3d 321, 331 (2d Cir. 1998) , *vacated on other grounds by* 527 U.S. 1031 (1999)) ("'In the context of

the Rehabilitation Act, intentional discrimination against the disabled does not require personal animosity or ill will. [citations omitted]. Rather, intentional discrimination may be inferred when a 'policymaker acted with at least deliberate indifference to the strong likelihood that a violation of federally protected rights will result from the implementation of the [challenged] policy ... [or] custom.'''"); *S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 263-65 (3d Cir. 2013); *Meagley v. City of Little Rock*, 639 F.3d 384, 389 (8th Cir. 2011) ("The district court decided that deliberate indifference was the appropriate standard for showing intentional discrimination in this type of case. A number of other circuits have so ruled, and we agree."); *Duvall v. Cty. of Kitsap,* 260 F.3d 1124, 1138 (9th Cir.2001) (citations and footnote omitted) ("To recover monetary damages under Title II of the ADA or the Rehabilitation Act, a plaintiff must prove intentional discrimination on the part of the defendant.... We now determine that the deliberate indifference standard applies."); *Powers v. MJB Acquisition Corp.,* 184 F.3d 1147, 1153 (10th Cir. 1999) ("[I]ntentional discrimination can be inferred from a defendant's deliberate indifference to the strong likelihood that pursuit of its questioned policies will likely result in a violation of federally protected rights."); *Liese v. Indian River Cty. Hops. Dist.*, 701 F.3d 334, 345 (11th Cir. 2012) ("We agree with the parties and hold that a plaintiff may demonstrate discriminatory intent through a showing of deliberate indifference.").

In particular, the Court finds that the Third Circuit's explanation for the adoption of deliberate indifference standard to be particular compelling. *Lower Merion Sch. Dist.*, 729 F.3d at 264. Of note, the Third Circuit explains:

> As an initial matter, the deliberate indifference standard is better suited to the remedial goals of the RA and the ADA than is the discriminatory animus alternative. In discussing the enactment of the RA and the ADA, the Supreme Court observed that "[d]iscrimination against the handicapped was perceived by Congress to be most often the product, not of invidious animus, but rather of thoughtlessness

and indifference—of benign neglect." *Alexander v. Choate,* 469 U.S. 287, 295, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985); *see also Chapman v. Pier 1 Imports (U.S.) Inc.,* 631 F.3d 939, 944–45 (9th Cir.2011) (applying *Choate's* discussion of the enactment of the RA to the ADA). Moreover, "[f]ederal agencies and commentators on the plight of the handicapped similarly have found that discrimination against the handicapped is primarily the result of apathetic attitudes rather than affirmative animus." *Alexander,* 469 U.S. at 296, 105 S.Ct. 712. Consistent with these motivations, the RA and the ADA are targeted to address "more subtle forms of discrimination" than merely "obviously exclusionary conduct." *Chapman,* 631 F.3d at 945. Thus, a standard of deliberate indifference, rather than one that targets animus, will give meaning to the RA's and the ADA's purpose to end systematic neglect. *See Choate,* 469 U.S. at 295, 105 S.Ct. 712 (noting that Senator Humphrey, who introduced the measure, stated that "we can no longer tolerate the invisibility of the handicapped in America" (quoting 118 Cong. Rec. 525–26 (1972))).

Moreover, the standard of deliberate indifference, while accommodating the RA's and the ADA's function in protecting the disabled, is also consistent with contract principles at play when legislation is passed via the Spending Clause. *See Liese,* 701 F.3d at 347. The RA and the ADA were enacted under Congress's Spending Clause power; legislation that is enacted under this power "is much in the nature of a contract" between the federal government and recipients of federal funds. *Pennhurst State Sch. & Hosp. v. Halderman,* 451 U.S. 1, 17, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981). "Just as a valid contract requires offer and acceptance of its terms, the legitimacy of Congress' power to legislate under the spending power rests on whether the recipient voluntarily and knowingly accepts the terms of the contract.' " *Barnes,* 536 U.S. at 186, 122 S.Ct. 2097 (alterations omitted) (quoting *Pennhurst,* 451 U.S. at 17, 101 S.Ct. 1531). The Supreme Court has thus reasoned that a recipient of federal funding, such as the School District here, may be held liable for money damages only when it is on notice by statute that it has violated the law. *Id.* (discussing monetary damages under Title VI); *Gebser,* 524 U.S. at 287, 118 S.Ct. 1989 (discussing monetary damages under Title IX).

*Id.*; *see also Liese*, 701 F.3d at 348 ("The deliberate indifference standard best reflects the purposes of § 504 while unambiguously providing the notice-and-opportunity requirements of Spending Clause legislation. A lower standard would fail to provide the notice-and-opportunity requirements to RA defendants, while a higher standard—requiring discriminatory animus—would run counter to congressional intent as it would inhibit § 504's ability to reach knowing discrimination in the absence of animus."). The undersigned agrees with this analysis and finds that the deliberate indifferent is the appropriate standard to take in regards to intentional discrimination and more

suited to "giv[ing] meaning to the RA's and the ADA's purpose to end systematic neglect." *Lower Merion Sch. Dist.*, 729 F.3d at 264.

As noted above, to show deliberate indifference, the Plaintiffs must show "(1) *knowledge* that a federally protected right is substantially likely to be violated…and (2) *failure to act* despite that knowledge." *Id.* First, in regards to the knowledge requirement, "[w]hen the plaintiff has alerted the public entity to his need for accommodation (*or where the need for accommodation is obvious, or required by statute or regulation*), the public entity is on notice that an accommodation is required, and the plaintiff has satisfied the first element of the deliberate indifference test." *Duvall*, 260 F.3d at 1124 (emphasis added). Second, in regards to the requirement to act, the Ninth Circuit has explained:

> Because in some instances events may be attributable to bureaucratic slippage that constitutes negligence rather than deliberate action or inaction, we have stated that deliberate indifference does not occur where a duty to act may simply have been overlooked, or a complaint may reasonably have been deemed to result from events taking their normal course. Rather, in order to meet the second element of the deliberate indifference test, a failure to act must be a result of conduct that is more than negligent, and involves an element of deliberateness.

*Id.* (citations omitted).

Finally, turning to the case at present, the Court finds that the Defendants have acted with deliberate indifference. As discussed above, the Defendants' bus stops were non-compliant and inaccessible. Moreover, it has been twenty-six years since the passage of the ADA, and the Defendants have failed to correct the barriers that exist throughout nearly 94 percent of the bus stops. Moreover, the Defendants have newly constructed or modified  at least 60 bus stops since the passage of the ADA that were not compliant despite the federal requirements putting them on notice to do so. R. Doc. 57-1, p. 18; *see also* R. Doc. 57-5. Plaintiff Miraglia also states that he brought these complaints to light in a meeting with a city councilman in 2008. R. Doc. 57-1, p. 9.

Moreover, the Manning Report issued in September 2015 detailing the extreme pervasiveness of the non-compliant bus stops further put the Defendants on notice. R. Doc. 1-7. Between that time and the filing of the complaint six months later, the Defendants have not pointed to any steps taken to correct those deficiencies since the issuance of that report because—in their words— they "have never had a meaningful opportunity to digest the findings of the Manning Report, enlist key players, or…implement any of the recommendations therein." R. Doc. 64, p. 8. Additionally, the Defendants also did not answer when the Plaintiffs requested information as to what plan the Defendants were implementing or attempting to create/implement *prior* to the instant lawsuit in January 2016 (R. Doc. 1-9). R. Doc. 57-1, p. 21. Given the foregoing, the Court finds that the Defendants were not only aware of their obligations and failure to provide accessible bus stops for the City's handicapped individuals but also that the refusal to correct barriers and the decision to construct/modify bus stops in a non-compliant fashion demonstrate deliberate indifference such that the Plaintiffs are entitled to compensatory damages.

### 5.   <u>Amount of Damages</u>

Certainly, both the Plaintiffs and the Defendants seem to acknowledge the dearth of information available to the Court in deciding the appropriate amount of damages to be awarded here. While the Plaintiffs note that their counsel has recovered damages ranging from $500 to $5,000 in other Title II cases, the Plaintiffs have not pointed to a comparable case for the Court to compare. As such, the Court must make a determination looking at the totality of the record. In so doing, the Court determines that that the Plaintiffs should be awarded $1,500 each. As such, the Motion to Determine Damages (R. Doc. 57) is **GRANTED.**

### III.     Motion to Determine Attorneys' Fees and Costs

In accordance with the Parties' Settlement Agreement (R. Doc. 55) and this Court's order (R. Doc. 54), the Plaintiffs submitted their Motion to Determine Attorneys' Fees and Costs on February 20, 2017. The Plaintiffs seek $50,840.50 in attorneys' fees (R. Doc. 61; 69) and $7,573.96 in expenses and costs (R. Doc. 61-5, p. 35; 61-20). The Defendants have opposed this motion. R. Doc. 64. In addition to challenging the hourly rates, the hours expended, and the costs, the Defendants also argue that the Plaintiffs are not a prevailing party and therefore are not entitled to attorneys' fees and costs. R. Doc. 64, p. 5.

#### A.     Plaintiffs Are Prevailing Parties and Entitled to Attorneys' Fees

The ADA states that "[i]n any action or administrative proceeding commenced pursuant to this chapter, the court or agency, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorneys' fee, including litigation expense and costs." 42 U.S.C. § 12205. "The touchstone of the prevailing party analysis is whether there has been a material alteration of the legal relationship….Such a change in the parties' relationship can be effectuated through an enforceable judgment or, as in this case, a consent decree or settlement." *Grisham v. City of Fort Worth Texas*, 837 F.3d 564, 568 (5th Cir. 2016).

Here, the Defendants argue that under *Buckhannon on Bd. & Care Home, Inc. v. West Virginia Department of Health & Human Resources*, 532 U.S. 598 (2001) the Plaintiffs are not prevailing parties because they did not receive a judgment on the merits or a consent decree. R. Doc. 64, p. 4-8. *See also Mark v. New Orleans City*, No. 15-7103, 2017 WL 2374392, at *1 (E.D. La. May 4, 2017) (presenting similar arguments), *report and recommendation adopted by* 2017 WL 2364228 (E.D. La. May 30, 2017).

However, this argument is without merit. The Parties entered into a voluntary settlement agreement that has been approved by this Court (R. Doc. 54), and the Court has retained the Jurisdiction to enforce that settlement agreement (*Id.*). This clearly creates the kind of material alteration in the legal relationship. While it may be called a "settlement agreement," the agreement is enforceable by this Court's order and retention of jurisdiction to enforce its terms. This satisfies the test under *Buckhannon*, 532 U.S. 604 (internal citations and quotations omitted) ("we have held that settlement agreements enforced through a consent decree may serve as the basis for an award of attorney's fees. Although a consent decree does not always include an admission of liability by the defendant, it nonetheless is a court-ordered chang[e][in] the legal relationship between [the plaintiff] and the defendant.").

**B.**     <u>Standard of Review</u>

The Supreme Court has specified that the "lodestar" calculation is the "most useful starting point" for determining the award for attorney's fees. *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). Lodestar is computed by "… the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Id.* The lodestar calculation, "...provides an objective basis on which to make an initial estimate of the value of a lawyer's services." *Id.* Once the lodestar has been determined, the district court must consider the weight and applicability of the twelve factors delineated in *Johnson*. *See Watkins v. Forcide*, 7 F.3d 453, 457 (5th Cir. 1993).[1] Subsequently, if the *Johnson* factors warrant an adjustment, the court may make modifications upward or downward to the lodestar. *Id.* However, the lodestar is presumed to be a reasonable calculation

---

[1] The twelve *Johnson* factors are (1) the time and labor involved; (2) the novelty and difficulty of the questions; (3) the skill required to perform the legal services properly; (4) the preclusion of other employment by the attorney due to this case; (5) the customary fee; (6) whether fee is fixed or contingent; (7) time limitations; (8) the amount involved and results obtained; (9) the experience, reputation and ability of counsel; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *See Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-719 (5th Cir. 1974).

and should be modified only in exceptional circumstances. *Id.* (citing *City of Burlington v. Dague*, 505 U.S. 557, 562 (1992)).

The party seeking attorney's fees bears the burden of establishing the reasonableness of the fees by submitting "adequate documentation of the hours reasonably expended", and demonstrating the use of billing judgement. *Creecy v. Metro. Prop. & Cas. Ins. Co.*, 548 F. Supp. 2d 279, 286 (E.D. La. 2008) (citing *Wegner v. Standard Ins. Co.*, 129 F.3d 814, 822 (5th Cir.1997)).

### C.   <u>Reasonable Hourly Rate</u>

The "appropriate hourly rate. . .is the market rate in the community for this work." *Black v. SettlePou, P.C.*, 732 F.3d 492, 502 (5th Cir. 2013) (citing *Smith & Fuller, P.A. v. Cooper Tire & Rubber Co.*, 685 F.3d 486, 490 (5th Cir.2012)). Moreover, the rate must be calculated "at the 'prevailing market rates in the relevant community for similar services by attorneys of reasonably comparable skills, experience, and reputation.'" *Int'l Transp. Workers Fed'n v. Mi-Das Line, SA*, 13–00454, 2013 WL 5329873, at *3 (E.D. La. Sept. 20, 2013) (quoting *Blum v. Stenson*, 465 U.S. 886, 895 (1984)). Satisfactory evidence of the reasonableness of the rate necessarily includes an affidavit of the attorney performing the work and information of rates actually billed and paid in similar lawsuits. *Blum*, 465 U.S. at 896 n.11. Finally, if the hourly rate is not opposed, then it is *prima facie* reasonable. *Powell v. C.I.R.*, 891 F.2d 1167, 1173 (5th Cir. 1990) (quoting *Islamic Ctr. of Mississippi v. City of Starkville*, 876 F.2d 468, 469 (5th Cir. 1989)).

The Plaintiffs have stated that the hourly rates for their attorneys are: $300 for Andrew Bizer; $175 for Garret DeReus; $150 for Marc Florman; and $100 for paralegal and law clerks. R. Doc. 61-1, p. 13. For the attorneys, Bizer has roughly 14 years of experience, and DeReus and Florman each have 4 years of experience. As such, the Court finds these rates to be reasonable.

*See, e.g., EnVen Energy Ventures, LLC v. Black Elk Energy Offshore Operations, LLC*, No. 14-424, 2015 WL 3505099, at *2 (E.D. La. June 2, 2015) (awarding $300 for an attorney with 10 years of experience); *Cameron v. Greater New Orleans Fed. Credit Union*, No. 16-8514, 2017 WL 1426970, (E.D. La. Apr. 21, 2017) (approving $300 hourly rate for partner with 9 years' experience and $190 for associate with roughly four years of experience); *see also Calix v. Marine, LLC*, No. 14-2430, 2016 WL 4194119, at *6 (E.D. La. July 14, 2016) *report and recommendation adopted*, 2016 WL 4180977 (approving $180 for first year associate); *Atel Mar. Investors, LP v. Sea Mar Mgmt., LLC,* No: 08–1700, 2011 U.S. Dist. LEXIS 68436, 2011 WL 2550505 (E.D. La. June 27, 2011) (Roby, M.J.) (awarding $175 for an associate with two (2) years of experience);*Construction South, Inc. v. Jenkins,* No. 11–1201, 2011 U.S. Dist. LEXIS 99254, 2011 WL 3882271 (E.D.La. July 29, 2011) (Knowles, M.J.) (awarding $180/hour for an associate with two (2) years of experience).

The $100 per hour for the paralegal and law clerk work is also reasonable. *See, e.g., Loiacano v. DISA Global Sols.*, Civ. A. No. 14-1750, 2016 WL2926679, at *2 (E.D. La. May 19, 2016) (awarding $150.00/hour for a paralegal); *Norris*, 2016 WL 1046101, at *10 (awarding $80.00/hour for a paralegal); *United States v. Russel Grillot, Grillot Constr., L.L.C.*, Civ. A. No. 14-2539, 2015 WL 9672688, at *5 (E.D. La. Dec. 14, 2015) (awarding $125.00/hour for a paralegal); *Offshore Marine Contractors, Inc. v. Palm Energy Offshore, L.L.C.*, Civ. A. No. 10-4151, 2015 WL 5306229, at *3 (E.D. La. Sept. 10, 2015) (awarding $100.00/hour for a paralegal); *In re Hollander*, Case No. 04-14550, 2015 WL 4456070, at *7-7 (Bankr. E.D. La. July 20, 2015) (awarding $90.00/hour for a paralegal).

### D.   Hours Reasonably Spent on Litigation

Next, the court must determine what hours of time were reasonably expended on the litigation.   The party seeking the fee bears the burden of documenting and supporting the reasonableness of all time expenditures that compensation is sought. *Hensley*, 461 U.S. at 437. The "[c]ounsel for the prevailing party should make a good faith effort to exclude from fee request hours that are excessive, redundant, and otherwise unnecessary…" *Id.*  at  434. Hours that are not properly billed to one's client also are not properly billed to one's adversary. *Id*. The Supreme Court calls on fee applicants to make request that demonstrate "billing judgement". *Id.*  The remedy for failing to exercise "billing judgment" is to exclude hours that were not reasonably expended.  *See Hensley*, 461 U.S. at 434; *Walker v. City of Mesquite*, 313 F.2d 246, 251 (5th Cir. 2002) (quoting *Walker v. HUD*, 99 F.3d 761, 770 (5th Cir.1996)) ("If there is no evidence of billing judgment, however, then the proper remedy is not a denial of fees, but a reduction of 'the hours awarded by a percentage intended to substitute for the exercise of billing judgment.'").

Here, the Plaintiffs have provided billing statements showing that: Bizer billed 68.73 hours; DeReus billed 121.94 hours; Florman billed 19.06 hours; and that the law clerks/paralegals billed a total of 60.23. R. Doc.61-5, p. 35; 69-1, p. 4. In billing these hours, the Court notes that the attorneys appear to have exercised billing judgment. Moreover, the Court finds that the hours billed are largely reasonable *except* as noted below.

The Defendants object to hours billed on a total of eight separate bases. R. Doc. 64. The Court finds that a few of these arguments should be addressed. First, in regards to the Defendants' complaint that a number of hours are duplicative given the interoffice communications and conferences. R. Doc. 64, p. 16. In total, the Defendants have identified entries totaling 45.09 hours allegedly connected to these interoffice communications. R. Doc. 64-4. As the Defendants

acknowledge, the Plaintiffs have already reduced those hours to 38.60 hours, or a 14 percent reduction. R. Doc. R. Doc. 64, p. 17. After reviewing those entries, the Court is satisfied with that reduction and demonstration of billing judgment.

Second, the Defendants also complain about the hours billed in regards to filing of the instant motion as well as in general in this case are excess, unproductive, redundant, or some combination of those because of the Plaintiffs' counsel prior experiences as ADA attorneys. However, in looking at the filings in this proceeding, the amount of legal research involved, and the complexity of the issues, the Court is satisfied that the hours expended were reasonable in this regard. As another judge has recently noted, the Defendants' complaints about the hours expended on the Motion for Fees are belied by the exacting and detailed nature of the opposition. *See Mark*, 2017 WL 2374392, at *3 ("Yet the Court notes that defendants filed a 25-page opposition, litigating everything from whether Mark is a prevailing party to whether they—who are not prevailing parties—are entitled to their own attorneys' fees….A defendant 'cannot litigate tenaciously and then be heard to complain about the time necessarily spent by the plaintiff in response.'") (quoting *Copeland v. Marshall*, 641 F.2d 880 (D.C. Cir. 1980)).

Third, the Defendants complain about a number of block-billed or vague entries. *See* R. Doc. 64-6. However, on its review, the only entries that the Court has concerns about block-billing[2] are those entries billed by the Law Clerk. However, the Plaintiffs have already reduce those hours from the billing statement. R. Doc. 64-6.

---

[2] Block Billing is "time-keeping method by which an attorney lumps together the total daily time spent working on a case, rather than itemizing the time expended on specific tasks." *Canon U.S.A., Inc. v. S.A.M., Inc.*, No. 07–1201, 2009 WL 35334, at *4 (E.D. La. Jan. 6, 2009) (citing *Robinson v. City of Edmond*, 160 F.3d 1275, 1283, n. 9 (10th Cir.1998)). "This practice makes it impossible for the Court to determine the reasonableness of the hours spent on each task." *Id.*

Fourth, the Defendants complain that the fee agreement has not been produced and that the Plaintiffs' attorneys have billed for a number of pre-suit hours. R. Doc. 64, p. 12-13. As for the fee agreement, the Court is unaware of any requirement that such an agreement be produced before it can award attorneys' fees—nor have the Defendants pointed to any applicable case law. As for the pre-suit activity, prior to the first entry indicating client communication on January 28, 2016, there appears to be a number of entries suggesting that the Plaintiffs' attorneys began developing the case with certain clients in mind. However, it is unclear if the clients had been contacted at that point or this was client development work. Generally, hours expended prior to client recruitment are not awarded. Here, the Plaintiffs' attorney appear to have billed for 5.7 hours for work done from January 24, 2016 to January 28, 2016 prior to the first entry of "Call three clients and discuss case." R. Doc. 61-5, p. 1. Finding these hours are not necessarily or reasonably expended, the Court will reduce the total reasonable hours expended for Bizer by .5 hours and DeReus by 5.2 hours.

The Defendants also complain that a number of hours represented clerical work that was not properly billed. R. Doc. 64-5, p. 1. In reviewing the entries identified by the Defendants, the Court agrees that .1 hours billed by Florman (the October 20, 2016 entry for simply emailing documents to expert) and .1 hours billed by DeReus (the January 28, 2016 entry for taking call about availability of documents for pick up) are improperly billed. As such, the Court will reduce those hours.

Finally, the Defendant has identified a total of 2.6 hours that should have been reduced but were not due to clerical error. R. Doc. 64, p. 13-14. The Court will reduce those hours. The Defendants have also identified another 2.8 billed in connection with the motion for damages— which the Parties agreed would not be billed. *Id.* at p. 14. As such, the Court will reduce those

hours as well such that DeReus's hours are further reduced by .15 hours; Bizer's hours by 5.05 hours; and Florman by .2 hours.

The Court therefore finds that the reasonable hours expended by the Plaintiffs' attorneys are: 63.18 hours, 116.49 hours, 18.76 hours, and 60.23 hours for Bizer, DeReus, Florman, and the Paralegal/Law Clerk, respectively.

### E.    *Lodestar* Calculation

Given the foregoing reasonable rates and hours, the Court calculates the following *Lodestar* amount for each firm as:

| Attorney | Reasonable Hourly Rate | Reasonable Hours Expended | *Lodestar* Amount |
|---|---|---|---|
| Andrew Bizer | $300.00 | 63.18 | $18,954.00 |
| Garrett DeReus | $175.00 | 116.49 | $20,385.75 |
| Marc Florman | $150.00 | 18.76 | $2,814.00 |
| Law Clerk/Paralegal | $100.00 | 60.23 | $6,023.00 |
| | | **Subtotal:** | **$48,176.75** |

The total *Lodestar* amount then is **$48,176.75**.

### F.    **Adjusting the *Lodestar***

After the lodestar is determined, the Court may then adjust the lodestar upward or downward depending on the twelve factors set forth in *Johnson*, 488 F.2d at 717-19. However, "the Supreme Court has limited greatly the use of the second, third, eighth, and ninth factors for enhancement purposes, and accordingly, the Fifth Circuit has held that '[e]nhancements based upon these factors are only appropriate in rare cases supported by specific evidence in the record and detailed findings by the courts.'" Wells Fargo Equip. Fin., Inc. v. Beaver Const., LLC, No. CIV. 6:10-0386, 2011 WL 5525999, at *3 (W.D. La. Oct. 18, 2011) (citing Walker v. U.S. Department of Housing and Urban Development, 99 F.3d 761, 771–72 (5th Cir. 1996)). Finally,

to the extent that any *Johnson* factors are subsumed in the lodestar, they should not be reconsidered when determining whether an adjustment to the lodestar is required. *Migis v. Pearle Vision*, Inc., 135 F.3d 1041, 1047 (5th Cir. 1998). The Court has carefully evaluated the *Johnson* factors and finds no adjustment of the lodestar is warranted.

### G.      Expenses and Costs

Under Federal Rule of Civil Procedure 54(d), the Plaintiff may be awarded costs. ""The Supreme Court has indicated that federal courts may only award those costs articulated in [28 U.S.C. § 1920] absent explicit statutory or contractual authorization to the contrary." *Gagnon v. United Technisource, Inc.,* 607 F.3d 1036, 1045 (5th Cir.2010) (quoting *Cook Children's Med. Ctr. v. The New England PPO Plan of Gen. Consolidation Mgmt., Inc.,* 491 F.3d 266, 274 (5th Cir.2007)). Under § 1920, the following are allowed as costs:

> (1) Fees of the clerk and marshal; (2) Fees for printed or electronically recorded transcripts necessarily obtained for use in the case; (3) Fees and disbursements for printing and witnesses; (4) Fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case; (5) Docket fees under section 1923 of this title; (6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title.

28 U.S.C. § 1920. "[U]nder 42 U.S.C. § 12205, the prevailing party in an action brought pursuant to the ADA may additionally recover litigation expenses and costs, which are defined in the preamble of the ADA as including 'items such as expert witness fees, travel expenses, etc.'" *Mark*, 2017 WL 2374392, at *4 (quoting *Gilmore v. Elmwood South, L.L.C.*, Civ. A. No. 13-37, 2015 WL 1245770 at *7 (E.D. La. Mar. 18, 2015) (citing 28 C.F.R. Pt. 35, App. A)).

Here, the Plaintiffs have requested the following costs: $400 for filing fees; $262.50 for Service Fees; $4,300 for Expert Heybeck's Report; $485.96 for Expert's travel; $150 for Service of Subpoenas; $1,100 for Expert Maffey's Report; $114.00 for copies of necessary documents in

previous NORTA case; $25.00 in other copying costs; and $736.50 for deposition transcripts.[3] In total then, the Plaintiffs seek $7,573.96. The Court finds these costs to be appropriate and properly awarded under 28 U.S.C. § 1920 and/or 42 U.S.C. § 12205.

### H.    Defendants' Complaints Concerning Pre-Suit Notice

Here, the Defendants argue that the lack of pre-suit notice or efforts to resolve these issues identified in this litigation are just considerations that weigh against the award of fees in this case. R. Doc. 64, p. 18-21. As United States Magistrate Judge Daniel Knowles, III recently noted, there appears to be no case law requiring pre-suit notice required under the ADA. *Mark*, 2017 WL 2374392, at *5. Nor is there any court policy in this District at this this time requiring pre-suit notice. As such, the Court will not "den[y] fees by subjecting [Plaintiffs] to a requirement not found in the ADA or the case law." *Doran v. Del Taco, Inc.*, 237 F. App'x 148, 2007 WL 1492921 at *1 (9th Cir. May 21, 2007) (unpublished).

## IV.    Conclusion

Accordingly,

**IT IS ORDERED** that the Plaintiffs' **Motion to Determine Damages (R. Doc. 57) is GRANTED.**

**IT IS FURTHER ORDERED** that Plaintiffs Francis Falls, Mitchell Miraglia, and Thad Tatum are awarded **$1,500 each.**

**IT IS FURTHER ORDERED** that the Plaintiffs' **Motion to Determine Attorneys' Fees and Costs (R. Doc. 61)** is **GRANTED.**

---

[3] The Plaintiffs only seek 50 percent of the cost of these deposition because the depositions were used in two separate litigations.

**IT IS FURTHER ORDERED** that the Plaintiffs' are awarded $48,176.75 in attorneys'

fees and $7,573.96 in costs and expenses for a total of **$55,750.71.**

New Orleans, Louisiana, this 21st day of June 2017.

**KAREN WELLS ROBY**
**UNITED STATES MAGISTRATE JUDGE**